UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ERIC RODRIGUEZ,

                                        Plaintiff,

                    v.

TOWN OF RAMAPO; LINDA CONDON; and
ANTHONY SHARAN,

                                        Defendants.

No. 18-CV-1878 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Allison Mary Walsh, Esq.
Gabbard & Kamel PLLC
New York, NY
*Counsel for Plaintiff*

Leo Dorfman, Esq.
Shaunak Shah, Esq.
Sokoloff Stern LLP
Carle Place, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Eric Rodriguez ("Plaintiff") brings this Action against the Town of Ramapo (the "Town" or "Ramapo"), Superintendent of the Town Highway Department Anthony Sharan ("Sharan"), and Town Personnel Administrator Linda Condon ("Condon") (collectively, "Defendants"), alleging that Defendants discriminated and retaliated against him on the basis of race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, § 1983, and § 2000e *et seq.*; and New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*

(Proposed Second Am. Compl. ("PSAC") (Dkt. No. 49).) [1,2]  Before the Court are Defendants'

Motion To Dismiss, (Not. of Mot. To Dismiss (Dkt. No. 40)), and Plaintiff's Cross-Motion To

Amend, (Not. of Mot. To Amend (Dkt. No. 49)).[3]  For the following reasons, Plaintiff's Motion

is granted in part and denied in part, and Defendants' Motion is granted in part and denied in

part.

## I.  Background

### A.  Factual Background

The following facts are taken from Plaintiff's PSAC and are assumed to be true for

purposes of resolving the instant Motions.[4]

### 1.  Plaintiff's Position

Plaintiff, who is Hispanic, (PSAC ¶ 11), was employed in the Highway Department of

the Town from April 2008 until November 30, 2017, at which time he was discharged for

misconduct and insubordination, (*id.* ¶ 4).  The Town hired Plaintiff as a seasonal laborer in

2008.  (*Id.* ¶ 11.)  He was soon thereafter hired in a permanent role and passed his probationary

---

[1] Plaintiff also states that he brings this Action pursuant to Westchester County Human Rights Law, (PSAC 1), but does not cite any specific provision and does not specify what cause of action he wishes to assert thereunder.  Therefore, the Court does not consider Plaintiff to have asserted any separate claims under Westchester County Human Rights Law.

[2] Plaintiff originally sued Town Attorney Beth Finkelstein and Hearing Officer Jonas Gelb, (Compl. (Dkt. No. 1)), but by Stipulation of Partial Discontinuance Plaintiff withdrew with prejudice all claims against them, (Dkt. No. 36).  Plaintiff also withdrew with prejudice all Title VII claims against Condon.  (Dkt. No. 37.)  The Court only references the dismissed Defendants to the extent necessary.

[3] Plaintiff includes both his Notice of Motion and the PSAC in the same document.  (Dkt. No. 49.)

[4] The Court will note where Plaintiff's PSAC substantially adds, deletes, or changes the facts as described in Plaintiff's Amended Complaints.

period.  (*Id*.)  Plaintiff possessed a Commercial Driver's license Class B, with multiple

endorsements, allowing him to operate heavy machine vehicles.  (*Id*.)  Plaintiff worked in the

Highway Department without incident for several years, with no disciplinary memoranda in his

official personnel file save one warning him about tardiness.  (*Id*. ¶ 12.)[5]

Plaintiff was employed mainly on the blacktop crew, which involved filling potholes and

repaving roads and was allegedly perceived to be the hardest and dirtiest work of the Highway

Department.  (*Id*.)  The blacktop crew used shovels and rollers to lift and even out the hot

material that the crew obtained at plants where they ordered the amounts of blacktop they were

told to obtain, which often varied, sometimes twice per day.  (*Id*.)  Other crews allegedly painted

and performed tree and sign work.  (*Id*.)

The blacktop crew workers traveled in pairs in trucks that were equipped with GPS

tracking devices.  Assignments, work orders, and terms of work allegedly varied over time and

with different supervisors.  (*Id*. ¶ 13.)  At the end of each day someone on a truck was supposed

to take the work orders and fill out a report of what work had been done, and how much blacktop

they had picked up from the plants supplying it.  (*Id*.)  Usually, the non-driver in the truck would

do the paperwork.  (*Id*.)  Plaintiff alleges that despite being the driver in most instances, multiple

foremen requested that he do the paperwork because of his superior penmanship.  (*Id*.)

## 2.  Discrimination in the Highway Department

Plaintiff alleges that during his tenure in the Town Highway Department, he witnessed

and experienced  inferior treatment of minorities, and of himself in particular, as he was

repeatedly denied training and promotional opportunities that went to Caucasian employees.  (*Id*.

---

[5] This paragraph is labeled as "22" on page 3 of the PSAC, but it is placed between
paragraphs 11 and 13.  "22" appears to be an error, so the Court refers to this paragraph as "12."

¶ 14.)  Sharan was the Superintendent of the Town Highway Department.  Plaintiff alleges

Sharan "engaged in a campaign of discrimination and retaliation" against Plaintiff.  (*Id*. ¶ 5.)

Sharan allegedly "devised ever-new, arbitrary testing requirements in a seeming attempt

to evade having to promote [Plaintiff] to Motor Equipment Operator II ('MEO II'), a

promotional spot for which Plaintiff's experience qualified him."  (*Id*. ¶ 14.)  Plaintiff alleges

that others, including Robert Van Dunk ("Van Dunk"), believed the work environment to be

racist.  Plaintiff alleges that he was usually paired on a truck with the other person of Hispanic

origin in the Department, Ismael Rosario ("Rosario").  (*Id*.)

Sharan, Eddie O'Carroll ("O'Carroll"), and other managers and workers in the Highway

Department allegedly had a long history of making racially disparaging comments.  Plaintiff

alleges that O'Carroll, a foreman, "used the term nigger some time ago."  (*Id.* ¶ 15.)  Plaintiff

alleges that Caucasian employees "isolated minorities and harassed them in petty ways, such as

over the break room."  (*Id*.)  Sharan allegedly harassed a nonwhite employee who left the

department when he was unable to take the harassment.  That employee later committed suicide,

and Sharan allegedly said, to an audience of Highway Department workers, upon learning of the

suicide, "it's one less person on the payroll."  (*Id*.)[6]  Plaintiff was also troubled by Sharan's

preferential treatment of Caucasians, including his son, James Sharan, who held the title of MEO

II, even though he allegedly did not even have a driver's license and was therefore without the

minimum qualifications for the position.  (*Id*. ¶ 16.)

Condon is the Town's Personnel Administrator, and as such is charged with

administering an orderly and fair system of civil service employment.  (*Id*. ¶ 5.)  Plaintiff alleges

---

[6] The allegations about O'Carroll, the allegations about the employee committing suicide,
and Sharan's related comments were added in the PSAC.

that he and other non-white employees of the Highway Department made multiple complaints to Condon, who routinely dismissed them summarily. (*Id*. ¶ 16.) Other non-white employees who reported claims to Condon included Rosario, Van Dunk, and Jason Boddy ("Boddy"). (*Id*.) Plaintiff alleges that, by contrast, Condon took Caucasian employees' complaints about their nonwhite counterparts seriously. Plaintiff further alleges that "[n]on-white employees who did not complain about discrimination fared better than those who did." (*Id*.) Plaintiff alleges that Condon failed to implement a rational civil service system as she was required to do under New York Civil Service Law, failed to implement EEO training, and failed to establish performance evaluations or other objective measures of performance to prevent discrimination. (*Id*. ¶ 17.)

In 2015, an MEO II opening was posted in the Department, and Plaintiff applied. Plaintiff alleges that promotions had never been implemented based on a road test before, but now, for the first time, Sharan required one. (*Id*. ¶ 18.) Plaintiff's coworkers allegedly referred to it as "the Eric test," because nobody had ever been required to submit to a road test in order to become an MEO II. (*Id*.) The Rockland County examiner allegedly told Plaintiff he had passed and would be a great MEO II. (*Id*.) Soon thereafter, Sharan allegedly told Plaintiff he had failed and showed Plaintiff a written copy of the test report with scores that appeared to have been erased and written over. (*Id*.) After this incident, Plaintiff was in despair and "could take no more unfairness." (*Id*. ¶ 19.) Plaintiff went to Sharan's office and told Sharan that he would expose to the public Sharan's discriminatory treatment of minorities and the fact that Sharan's son was earning a high salary as a MEO II even though he was not qualified for that position. (*Id*.) That night, Sharan called Plaintiff at home and told him he would get his promotion. (*Id*. ¶ 20.) Plaintiff alleges that almost immediately thereafter, Sharan began a campaign of

surveillance and harassment against Plaintiff, seeking to establish a record on which he could charge Plaintiff and have him fired.  (*Id*.)

### 3.  The Alleged Harassment Campaign

On several occasions after his warning to Sharan about going public, colleagues told Plaintiff that Sharan had allegedly asked other colleagues to monitor him.  (*Id.* ¶ 21.)  A departmental supervisor, Thomas DeMont ("DeMont"), or Van Dunk, would from time to time appear at worksites where they previously would not be present without explanation or apparent purpose.  (*Id*.)  Other friends allegedly told Plaintiff that when they were interviewing for supervisor posts, Sharan asked them if they would be willing to "go after" certain employees at his request.  (*Id*.)

On August 10 and August 12, 2015, Plaintiff worked and filled out the paperwork as he usually did.  (*Id.* ¶ 22.)  Plaintiff alleges that if he was asked to obtain four tons of blacktop to fill potholes or pave roads, he ordered four tons in two equal loads, one each morning and one each afternoon.  (*Id*.)  Plaintiff alleges that he adjusted if his job orders did not warrant a full load of blacktop.  (*Id*.)  Plaintiff alleges that orders were not always filled precisely.  (*Id*.)  For example, if an employee asked for two tons, he might receive 1.92 tons, because the machinery dispensing blacktop into the truck from the chute was not precise.  (*Id*.)  Plaintiff alleges that the Highway Department practice was for workers to report at the end of each day the total amount of blacktop requested for the day and to report whether they had completed the work orders they had been assigned.  (*Id*.)  Plaintiff alleges that on August 10 and August 12, 2015, he reported that he had both completely fulfilled his work orders, and had received four tons for one of the two August days, but the blacktop receipts did not exactly match the work orders.  (*Id*.)  Plaintiff alleges that it "was quite expected and usual for the receipts to not match up with the total tons

requested, and this had never been a problem before." (*Id.*) The next week DeMont called Plaintiff to his desk to discuss the paperwork, and explained that the receipt should match the report and that Plaintiff's receipts did not match for the dates in August. (*Id.* ¶ 23.) Plaintiff explained that was not how it had always been done in the past, but agreed to prepare the work reports differently in future, and did so. (*Id.*) DeMont allegedly indicated he was satisfied with Plaintiff's response, and Plaintiff's work continued as usual with no disciplinary memorandum or warning being issued. (*Id.*)

Plaintiff alleges that on October 27, 2015, he took work orders for the day and stopped at a plant where he got blacktop for the morning. (*Id.* ¶ 24.) After lunch at around 1:00 p.m., Plaintiff arrived to find the plant was loading the blacktop into the chute from which it drops into trucks and there was a line of trucks in front of him waiting to get blacktop. (*Id.*) Plaintiff alleges that he knew based on experience that it would take up to an hour before he would receive the four tons of blacktop that he planned to obtain, and his work day ended at 3:30 p.m. (*Id.*) Plaintiff called his supervisor at the time, Van Dunk, to let him know what was happening, and Van Dunk told Plaintiff to wait until around 2:00 p.m. (*Id.*) At about 1:47 p.m. Plaintiff and his truck partner, Charlie Flynn ("Flynn"), were still in line, with no movement ahead of them. (*Id.*) Plaintiff alleges that he "knew he would not be able to use the blacktop to complete more than one or two small patch jobs on his work order, and most of it would be wasted," so he and Flynn instead left the plant and went to a dumping ground so that Plaintiff could use the time to show Flynn how to clean the truck. (*Id.*) Plaintiff alleges he spent the whole day showing Flynn, who had never been on the blacktop crew before, how to work with blacktop. (*Id.*) At the end of that day Plaintiff filled out the order paperwork and went home. (*Id.* ¶ 25.) The next day Plaintiff was called to Sharan's office and told he had been insubordinate and had not

followed Van Dunk's orders. (*Id.*) Plaintiff explained the judgment call that he had made, and work proceeded as usual, with no disciplinary memorandum or warning being issued against him. (*Id.*)

At this point, in November 2015, Plaintiff realized that he was being subjected to "an unusual and increased level of scrutiny and criticism," and therefore went to the Rockland Chapter of the National Association for the Advancement of Colored People ("NAACP") and filed a discrimination complaint. (*Id.* ¶ 26.) Plaintiff spoke to Wilbur Aldridge ("Aldridge") and Willie Trotman ("Trotman"). (*Id.*) Within a month of Plaintiff's report to the NAACP, Aldridge reported to Plaintiff that he and Trotman had spoken with the Town Supervisor, Christopher St. Lawrence ("St. Lawrence"), and that he had told them he would look into the allegations and take appropriate action. (*Id.*)

In December 2015, Plaintiff had a verbal disagreement with Michael Brown, a Caucasian coworker, who allegedly is disliked by many. (*Id.* ¶ 27.) Eric Brown, another employee, recorded the disagreement in which Plaintiff swore. (*Id.*) Plaintiff alleges that no physical altercation occurred. (*Id.*) Plaintiff further alleges that during his time at the Highway Department, other workers had been involved in physical and verbal arguments and had not been disciplined. (*Id.*) Michael Brown had allegedly previously brought weapons used in martial arts to work and brandished them more than once and not been disciplined. (*Id.*) Michael Brown, with the aid of DeMont, wrote a complaint against Plaintiff, which Condon investigated. (*Id.*) Plaintiff also reported that Michael Brown had threatened him. (*Id.*) Plaintiff alleges that nothing was done about either incident except that a general warning was issued to the workers about workplace violence, similar to memoranda that had circulated in the past. (*Id.*)

On January 6, 2016, Plaintiff was given a promotion to MEO II.  (*Id*. ¶ 28.)  Plaintiff allegedly "succeeded" as an MEO II, but was still assigned to the blacktop crew, and was not given opportunity to utilize his skills operating equipment, while other Caucasian employees were given such opportunity.  Plaintiff was eventually assigned to another crew, where he "succeeded."  (*Id*.)[7]

On March 6, 2016, workers were told to report the next day at 4:00 a.m. for a snowstorm. (*Id*. ¶ 29.)  Plaintiff allegedly accidentally overslept and instead reported at his usual work time. (*Id*.)  He apologized to DeMont and explained he overslept because of problems at home.  (*Id*.) Plaintiff alleges that other Highway Department workers routinely failed to report for snow duty for a variety of reasons, with no disciplinary consequence.  (*Id*.)

On March 11, 2016, the Town of Ramapo served charges on Plaintiff for 13 alleged violations of law — including counts relating to theft of time, insubordination, criminal filing of a false report, and offenses related to the dispute with Michael Brown — and suspended him without pay for 30 days, the legal maximum suspension pending trial.  (*Id*. ¶ 30.)  Defendants sought Plaintiff's termination from employment.  (*Id*.)

Plaintiff alleges that New York law calls for progressive discipline of tenured civil servants, such that the penalty should be no harsher than needed and penalties should be gradually increased for repeated offenses.  (*Id*. ¶ 31.)  Plaintiff alleges that New York law provides that only if the penalties fail to induce improved performance or attendance, should an employer seek the final sanction, termination of employment.  (*Id*.)  Defendants, however, sought termination in Plaintiff's case—not suspension, fines, or demotion.  (*Id*.)

---

[7] The allegation that Plaintiff was moved to a new crew and succeeded there was added in the PSAC.

Condon and the Town Board approved the filing of these charges and the appointment of Jonas Gelb ("Gelb") as hearing officer, allegedly "without inquiring or caring whether a different path could be taken, such as a memorandum, a fine, or a suspension or demotion." (*Id.* ¶ 32.) Gelb is an administrative judge who allegedly rules for the Town in all or most disciplinary proceedings regardless of the merits of the cases. (*Id.*; *see also id.* ¶ 48 (alleging that Gelb, in presiding over another disciplinary proceeding, recommended that Melissa Reimer, a whistleblower whose evidence led to the conviction of St. Lawrence on federal corruption charges, be terminated).)

Plaintiff alleges that the charges against him, the administration of his administrative trial, the ultimate decision by Gelb, and Sharan's decision to terminate Plaintiff, were in deliberate retaliation for Plaintiff complaining, first to Sharan, then to the NAACP, and subsequently complaining to the Rockland County Commission on Human Rights. (*Id.* ¶ 34.)

On March 29, 2016, Plaintiff filed a charge of discrimination against The Town with the Rockland County Human Rights Commission, which in turn referred the charge to the New York State Human Rights the Division ("NYSDHR"). (*Id.* ¶ 33.) The NYSDHR found probable cause existed to believe the Town had discriminated against Plaintiff even before the disciplinary charges were tried. (*Id.* ¶¶ 7–8, 33; *id.* at Appendix A ("NYSDHR Determination").)[8] Plaintiff alleges he later amended his claim to assert allegations of illegal retaliation in violation of the Human Rights Law of the State of New York, N.Y. Exec. Law § 296, and Title VII. (*Id.* ¶ 33.) Ultimately, an administrative trial was scheduled by NYSDHR, but Plaintiff sought and

---

[8] Although Plaintiff states he filed his discrimination charge with the Rockland County Human Rights Commission on March 29, 2016 in his PSAC, (PSAC ¶ 33), and the NYSDHR Determination states that Plaintiff filed his charge on that date, Plaintiff at one point states, apparently erroneously, that he filed his charge in February 2016, (*id.* ¶ 7).

NYSDHR issued an Administrative Order of Dismissal so that Plaintiff could pursue federal claims. (*Id.* ¶ 8.)

### 4. The Administrative Trial

After Plaintiff told Sharan that he would report the illegal employment practices publicly, Sharan allegedly began the plan to fire Plaintiff, and began a plan to create a position for his son that would bear the same salary as his MEO II position and not require a driver's license. (*Id.* ¶ 42.) Condon actively participated in the discriminatory course of conduct against Plaintiff by, among other things, investigating Michael Brown's complaint, allowing Sharan to maintain secret files pretextually documenting problems with Plaintiff's performance without following proper disciplinary procedure, consulting with Town counsel to bring charges, and failing to take reasonable steps to prevent Sharan from retaliating against Plaintiff. (*Id.*)[9]

Plaintiff's trial on the thirteen charges lasted eleven days over a period of five months. For most of that time, Town Attorney Beth Finkelstein ("Finkelstein") presented the Town's case. (*Id.* ¶ 43.) Plaintiff alleges that Finkelstein objected to, and Gelb sustained objections to, almost all the evidence that Plaintiff attempted to present, including evidence of retaliation and evidence that the road test results of his promotional examination were altered. (*Id.*; *see also id.* ¶ 48 (alleging that Gelb's rulings prevented Plaintiff from presenting relevant evidence but gave Finkelstein wide latitude to introduce the Town's evidence).)[10] Plaintiff alleges that although the Town was able to present character reference testimony, he was not able to do so because Gelb

---

[9] The allegations with respect to Condon's involvement in the discrimination against Plaintiff during his administrative trial were added in the PSAC. (PSAC ¶ 42.)

[10] The allegations that Plaintiff attempted to introduce evidence that the Town brought charges against him in retaliation for his complaint of discrimination were added in the PSAC. (PSAC ¶ 43.)

sustained the majority of Finkelstein's objections. (*Id.* ¶ 43.) Gelb's rulings were allegedly in violation of New York State Civil Service Law § 75.2, which states, in part, that the rules of evidence do not apply to such proceedings. (*Id.*)

Plaintiff also alleges that Gelb may have been influenced by Finkelstein's offer to him of tickets to the popular musical Hamilton in full view of Plaintiff and his counsel. Gelb and Finkelstein allegedly regularly lunched together during the trial. (*Id.* ¶ 44).

At the trial, Plaintiff, for the first time, learned that the Town maintained a second, unofficial personnel file on Plaintiff located in the Highway Department building, although the New York Civil Service Law and the collective bargaining agreement between the Town and its unionized employees, including Plaintiff, expressly prohibit this. (*Id.* ¶ 45.) This file allegedly contained memoranda that were part of Sharan's attempt to build a case against Plaintiff for the purposes of terminating him because of Sharan's discriminatory and retaliatory animus against Plaintiff. (*Id.*) The file also allegedly contained material adverse to Plaintiff which he was never provided and which he never was afforded the opportunity to review, sign, and rebut. (*Id.*) Plaintiff alleges that this violated the collective bargaining agreement at Article X, Section 5, which provided that "there shall be only one official personnel file" and that "no complaint or report adverse to an employee will be retained in the employee's personnel file unless the employee has had an opportunity to read same and had an opportunity to sign same and an opportunity to provide and file a response to same." (*Id.*) Plaintiff alleges that he was never shown the memoranda in the file before his termination was sought, contrary to the "Civil Service guidance," which recommends that the employee, consistent with due process, should be shown the memorandum and given an opportunity to respond before it is placed in the personnel file. (*Id.*) Condon and Finkelstein allegedly both knew that the file and its use were unlawful

when they used it as the basis for proffering charges against Plaintiff and during the administrative hearing. (*Id.* ¶ 46.)

Witnesses for the prosecution were Highway Department workers, some of whom allegedly slanted or falsified testimony because of the atmosphere of fear pervading the Highway Department. (*Id.* ¶ 47.) Plaintiff alleges that the conduct of the trial was biased and contrary to civil service law and precedent, which encourage giving civil servants the fullest opportunity to defend themselves through generous evidentiary standards. (*Id.*)

### 5.  Plaintiff's Retaliation Defense

At the trial, Aldridge testified that he believed the Town's charges were retaliatory in nature and also, that he had warned Defendants not to proceed with charges against Plaintiff. (*Id.* ¶ 49.) Aldridge testified that he had requested and attended a meeting in Town Hall with St. Lawrence, Condon, Town Attorney Michael Klein, and Finkelstein, at the time an Assistant Town Attorney, in December 2015, to discuss Plaintiff's treatment. (*Id.*) Aldridge allegedly told Town representatives about certain incidents of discrimination and asked whether supervisors in the Town were trained to avoid unlawful discriminatory practices. (*Id.*) The Town representatives told Aldridge that they did not do any supervisory training to avoid discrimination, and instead wished to discuss problems Sharan claimed to be having with Plaintiff. (*Id.*) Aldridge recommended that the Town implement supervisor training and offered the NAACP's own multicultural training program which it provided in other towns in Rockland County. (*Id.*) St. Lawrence allegedly agreed with Aldridge that it was unfair to expect people to supervise without necessary training and suggested the Town might perform training to "get our people on board." (*Id.*) Aldridge testified that, at the meeting, Aldridge procured an agreement from Condon, Finkelstein, and St. Lawrence that Plaintiff would be transferred to another area

and that if there were further problems with Plaintiff that St. Lawrence would contact Aldridge or another NAACP Representative. (*Id.* ¶ 50.) Aldridge also testified that he told St. Lawrence and the Town Attorney that if there were any other charges brought against Plaintiff in a short period of time, this would appear to be retaliation for Plaintiff's making a discrimination complaint. (*Id.*) In order to avoid this, the Town representatives allegedly agreed that St. Lawrence would contact the NAACP before bringing charges against Plaintiff. (*Id.*) Aldridge testified he never heard from St. Lawrence again despite asking him if he had heard anything about Plaintiff. (*Id.* ¶ 51.) Within four months from the date of the Aldridge meeting with Defendants, Plaintiff was charged. (*Id.* ¶ 52.)

Even after learning that Plaintiff had filed a complaint with the Rockland County Commission on Human Rights, Defendants continued to prosecute the charges without contacting the NAACP. (*Id.* ¶ 53.) Plaintiff alleges that following Aldridge's testimony, Gelb was on notice that the charges had been brought in violation of state and federal law prohibiting retaliation. (*Id.* ¶ 54.) Plaintiff alleges Gelb knew that the claims brought against Plaintiff were retaliatory. (*Id.*)

Gelb ultimately found Plaintiff not guilty on some charges and guilty of five charges. (*Id.* ¶ 55.) The charges Gelb found Plaintiff guilty of were: Charge No. 4, relating to the October 27, 2015 incident when Plaintiff was allegedly insubordinate for not staying at the plant for as long as instructed by Van Dunk; Charge No. 5, relating to misrepresentations contained in the work report Plaintiff filed for October 27, 2015; Charge No. 11, relating to alleged misrepresentations contained in the work report Plaintiff filed for August 10, 2015, specifically as to the amount of materials used; Charge No. 12, relating to alleged misrepresentations contained in the work report Plaintiff filed for August 12, 2015, specifically as to the amount of

materials used; and Charge No. 13, relating to Plaintiff's failure to appear early for work on March 4, 2016 for snowplow duty. (Decl. of Leo Dorfman, Esq. ("Dorfman Decl.") Ex. C (Decision of Hearing Officer Jonas Gelb ("Gelb Decision") (Dkt. No. 41-3).)[11]

Gelb recommended termination, despite the availability of other, lesser disciplinary measures, which had allegedly been afforded Caucasian employees for much more serious offenses. (*Id.* ¶ 55.) In a letter dated November 23, 2016, Sharan informed Plaintiff that he had adopted Gelb's recommendation of termination, and the Highway Department notified Plaintiff of his termination effective November 30, 2016. (*Id.* ¶ 61.) Plaintiff alleges that had he never made his discrimination complaints, he would still be working for the Town of Ramapo. (*Id.*)

### 6. Pattern of Discrimination in the Highway Department

Plaintiff alleges that the Town generally "discriminate[d] against non-white workers by hiring disproportionately few of them[,] . . . by firing them in disproportionate numbers[,] and by disciplining [them] more harshly than Caucasian employees." (*Id.* ¶ 35.) Plaintiff further alleges that Caucasian Town employees guilty of serious misconduct were not disciplined in any serious manner, let alone terminated. (*Id.* ¶ 36.) Plaintiff cites several examples. For example, Plaintiff alleges that "Caucasian employees are never terminated for failing to report for snowplow duty; another Hispanic person, however, was terminated for this offense about a decade ago." (*Id.*)

---

[11] The Court may consider the Gelb Decision without converting these Motions into summary judgment motions. "In considering a motion to dismiss, the Court may consider documents attached as an exhibit thereto or incorporated by reference, documents that are 'integral' to plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken." *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (considering as "integral" and as "records and reports of administrative bodies" portions of disciplinary hearing transcript and hearing officer's report in Title VII discrimination case (citations omitted)). The Court may also take notice of "matters of public record." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998); *see Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015) (same).

Plaintiff alleges that Caucasian employees who file false instruments that are important to public safety remain in the Town's employ.  (*Id.*)  Plaintiff cites the example of Adam Peltz, the former Town fire inspector who was investigated for submitting falsified reports of inspections of Town Schools, who was suspended only briefly, and who currently works for the Town as an Assistant Fire Inspector.  (*Id.*)  Plaintiff also points to the example of a Building Inspector who falsified building reports and was allowed to resign, even while facing 188 felony counts to which he pleaded guilty.  (*Id.* ¶ 37.)

Plaintiff alleges that all non-managerial workers in the Highway Department and the Town are "subject to the same purely subjective performance standards and all in the Department are ostensibly on the same career path."  (*Id.*)  Plaintiff alleges these employees start by doing manual labor, ranging from blacktop, to "signs, trees or laying pipes, and are promoted on the same path from laborer to MEO other promotional spot, to supervisor to foreman."  (*Id.*)  Plaintiff points to several examples of misconduct by Caucasian employees inside the Highway Department who were not penalized as severely as he was, if at all.  For example, according to Plaintiff, John Meyers Jr. was allegedly caught on surveillance cameras in 2012 breaking into a highway department office and stealing highway department property, but was only briefly suspended and remains on the Town payroll in a different department.  (*Id.*)  Brian Downey allegedly repeatedly took a Highway Department truck to an unauthorized location but was only suspended for one month and demoted, and eventually returned to his former pay grade or even a higher pay grade.  (*Id.*)  Michael Migdallan was allegedly caught playing golf while on workers' compensation leave and repeatedly abuses his leave time but was not suspended or reprimanded in any way.  (*Id.*)  And, James Sharan allegedly not only held the position of MEO II without

having a driver's license, but he also allegedly crashed a Town-owned commercial vehicle and was not demoted or penalized.  (*Id*.)

### 7.  Hostile Work Environment and Policies Causing Disparate Impact

Plaintiff alleges that the Highway Department discriminates against and creates a hostile work environment for minorities in a number of ways.  (*Id.* ¶ 38.)  For example, minorities in the Highway Department are "denied promotional opportunities, harassed, and given unfavorable assignments and older, more dangerous equipment that is not adequately maintained, . . . [while] [w]hite employees are given new equipment and training."  (*Id.*)  Also, minority employees who do not complain allegedly "fare better than those who do."  (*Id*.)  Plaintiff alleges that he complained that his truck was causing him respiratory illness, but the Town refused to assign him to work on newer plow trucks; by contrast, when Caucasian employees requested new equipment, they allegedly received it or even received it without requesting it.  (*Id*.)  Plaintiff repeatedly asked his supervisors for time to train using the commercial equipment and was deprived of it, while Caucasian employees were offered such training time.  (*Id*.)

The Town allegedly engages in customs and maintains policies that have disparate impacts on non-whites and Plaintiff in particular.  (*Id.* ¶ 39.)  For example, Plaintiff alleges that there is no objective performance rating system in the Highway Department, that this allows for subjective assessments by Caucasian managers, and that these assessments are disproportionately unfavorable to minorities.  (*Id*.)  There is allegedly no time clock.  (*Id*.)  DeMont allegedly marks minorities who walk in the door at same time as Caucasian employees as having arrived late.  (*Id*.)  DeMont was allegedly recently investigated for theft of time because he is known to leave work to go golfing during work hours.  (*Id.*)  DeMont was briefly suspended but has returned to work without any apparent consequence beyond a suspension.  (*Id*.)

Plaintiff further alleges that the Town and the Highway Department "by practice and custom, engage[] in nepotism and ethnic tribalism in hiring practices." (*Id.*) Caucasian men allegedly almost exclusively have management and hiring duties. (*Id.*) The Highway Department and other Town departments "favor, hir[e] and promot[e] their own sons and others who are from similar ethnic and social groups more frequently than they hire and promote non-whites." (*Id.*) Plaintiff alleges that this practice disproportionately disfavors Hispanics, African-Americans, and other non-white minorities. (*Id.*) There is allegedly no EEO training of managers. (*Id.*) Condon is responsible for putting in place backstops against discrimination but allegedly fails to do so. (*Id.*) Instead, Condon allegedly promotes these discriminatory practices. (*Id.*)

Plaintiff alleges that "the Town by practice and custom, favors certain politically powerful ethnic groups, in particular, Orthodox Jewish people, who represent a large and active voting bloc." (*Id.*) The Town allegedly "treats employees in positions to favor this group more favorably than other employees, which results in disparate treatment of those who are not in such positions, *i.e.*, minority employees who are less likely to be in positions to issue licenses, permits[,] and other governmental benefits." (*Id.*) Condon allegedly promotes these discriminatory practices by, for example, allowing Adam Peltz to continue working for the Town even though he filed false reports, and allowing Building Inspector Anthony Mallia to retire with a pension even though he was criminally prosecuted for filing false reports. (*Id.*)[12]

Plaintiff further alleges that the Town adjusts requirements for promotions in order to avoid promoting minorities. For example, Sharan allegedly implemented a new road test,

---

[12] All of the allegations in PSAC ¶ 39, except for the allegations that there is no time clock and that DeMont leaves work to go golfing, were added in the PSAC.

nicknamed by coworkers the "Eric Test," when Plaintiff sought promotion.  (*Id*. ¶ 40.)  Plaintiff

alleges that Jamie Kelly was given a promotion, then failed probation, but was given another

promotional opportunity soon thereafter.  (*Id*.)  At the same time, Plaintiff's African-American

coworker was suspended for a short time period, allegedly "just so that he would lose seniority

he had over a white person, when a promotion was pending which the African-American would

have received."  (*Id*.)  The Caucasian employee allegedly obtained the promotion instead of

Plaintiff's African American colleague due to the time he lost during the suspension.  (*Id*.)  This

same African-American colleague later sought promotion and applied to take the test to become

a foreman, but he was never sent notice of the promotional test, and it was never publicly posted,

even though the applicable collective bargaining agreement allegedly required that test dates be

posted publicly.  (*Id.*)  Plaintiff's African-American colleague consequently missed the test

administration and a Caucasian colleague was given this job, and Condon allegedly did nothing

to remedy this situation.  (*Id*.)[13]

Plaintiff alleges that the "cumulative effects of all these different standards for minorities

is a hostile and demeaning work environment, intentionally designed to prevent minorities from

advancing while retaining the superior positions and pay that white men [enjoy]. . . .  It is meant

to humiliate minorities so that they feel they deserve less, and ask for less."  (*Id*. ¶ 41.)

### 8.  Consequences for Plaintiff

Since his termination, Plaintiff has used his pension funds to pay for rent and food for his

two daughters, both under the age of eight.  (*Id.* ¶ 62.)  He has felt depressed, ashamed and

embarrassed, because the Town treated him like a criminal.  (*Id.*)  Plaintiff alleges he has

---

[13] The allegations regarding Jamie Kelly and Plaintiff's African-American colleague were
added in the PSAC.  (PSAC ¶ 40.)

struggled to find work.  (*Id.*)  At one point he earned $23,000 on an annual basis as a school bus

driver then, only $18.00 per hour or $34,000 per year at a job he began last year.  (*Id.*)  At the

time of his termination his salary was $31.00 per hour, or about $71,000 annually.  (*Id.*)  Plaintiff

cannot replace the income he previously made.  (*Id.*)  Plaintiff alleges he has lost thirty pounds

due to the stress of not being able to provide for his children and the shame arising from his

victimization by Defendants.  (*Id.*)

The Town has opposed Plaintiff's claim for unemployment compensation.  (*Id.* ¶ 63.)

The New York State Department of Labor found that Plaintiff was not terminated for misconduct

or insubordination within the meaning of those terms for purposes of unemployment law.  (*Id.*)

Administrative Law Judge Stephen Ambrecht found, inter alia, that Plaintiff was not given notice

of procedures he was supposed to follow and that too much time had elapsed between the events

and the charges.  (*Id.*)

Finally, Plaintiff alleges that the EEOC issued Plaintiff a right to sue letter on November

27, 2017.  (*Id.* ¶ 9.)  Plaintiff further alleges he filed his Complaint within 90 days from the date

on which the Plaintiff's counsel received the EEOC's Right to Sue letter, specifically on

December 4, 2017.  (*Id.* ¶ 10.)  Plaintiff alleges that he did not receive his copy of the Right to

Sue letter until sometime thereafter.  (*Id.* ¶ 10.)[14]

---

[14] It is not clear from the pleading (in this counseled case) which causes of action Plaintiff
means to assert and under which provisions.  The enumerated claims all contain boilerplate
wording.  The Court understands Plaintiff to be bringing the following claims: (1) disparate
treatment claims under Title VII, (First Claim (PSAC ¶¶ 65–70) and Fourth Claim (PSAC ¶¶ 78–
80)), and § 1981, (Seventh Claim (PSAC ¶¶ 92–95)); (2) disparate impact, (Second Claim
(PSAC ¶¶ 71–75)); (3) Sharan altered Plaintiff's test scores because of Plaintiff's race in
violation of Title VII, 42 U.S.C. § 2000e-2(l), (Third Claim (PSAC ¶¶ 76–77)); (4) hostile work
environment (Second Claim (PSAC ¶¶ 71–75)); and (5) retaliation under Title VII (Fifth Claim
(PSAC ¶¶ 81–86)), and § 1983 (Sixth Claim (PSAC ¶¶ 87–91)).  Plaintiff also restates all claims
under New York State Human Rights Law.  (Eighth Claim (PSAC ¶¶ 96–98).)

Plaintiff filed his initial Complaint on March 1, 2018.  (Compl. (Dkt. No. 1).)  On May 3,

2018, counsel for Defendants submitted a pre-motion letter to the Court requesting permission to

file a Motion To Dismiss.  (Dkt. No. 16.)  On May 8, 2018, counsel for Plaintiff submitted a

letter opposing Defendants' request for a pre-motion conference and seeking to amend his

Complaint.  (Dkt. No. 17.)  On May 10, 2018, the Court instructed Plaintiff to file an Amended

Complaint.  (Dkt. No. 18.)

On May 25, 2018, Plaintiff filed an Amended Complaint.  (First Am. Compl. ("FAC")

(Dkt. No. 22).)  On June 15, 2018, counsel for Defendants submitted a pre-motion letter to the

Court requesting permission to file a Motion To Dismiss.  (Dkt. No. 25.)  On June 20, 2018,

counsel for Plaintiff submitted a letter opposing Defendants' request for a pre-motion

conference.  (Dkt. No. 27.)  The Court scheduled a pre-motion conference, (Dkt. No. 28),

however, on August 24, 2018, counsel for Plaintiff submitted a letter requesting to amend the

FAC, (Dkt. No. 31).  The Parties thereafter agreed to move forward with a Motion To Dismiss

briefing schedule, (Dkt. Nos. 33–34), and signed a Stipulation voluntarily dismissing certain

Defendants and claims from the FAC with prejudice, (Dkt. No. 37).

On October 31, 2018, Defendants filed the instant Motion To Dismiss and accompanying

papers.  (*See* Not. of Mot. To Dismiss; Dorfman Decl.; Defs.' Mem. of Law in Supp. of Mot. To

Dismiss ("Defs.' Mem.") (Dkt. No. 42).)  On December 14, 2018, Plaintiff filed his Opposition

to the Motion.  (*See* Aff. of Allison Walsh, Esq. ("Walsh Aff.") (Dkt. No. 46); Pl.'s Mem. of

Law in Opp'n to Mot. To Dismiss ("Pl.'s Mem.") (Dkt. No. 47); Aff. of Eric Rodriguez

("Rodriguez Aff.") (Dkt. No. 48).)  That same day, without seeking leave from the Court to

cross-move, Plaintiff filed the instant Motion To Amend.  (Not. of Mot. To Amend.)  Defendants

filed their Reply in Further Support of their Motion To Dismiss on January 16, 2019, in which they specifically addressed Plaintiff's Motion To Amend. (*See* Defs.' Mem. of Law in Further Supp. of Mot. To Dismiss ("Defs.' Reply") (Dkt. No. 50).)

The Parties submitted a letter on May 3, 2019 to clarify that although Plaintiff did not seek the Court's leave to file its Motion To Amend, the Parties wished to treat it as a properly made cross-motion to which Defendants have had an opportunity to respond. (Dkt. No. 51.) On May 6, 2019, the Court granted the Parties' request, (Dkt. No. 52), and accordingly treats the Motion To Amend as a properly-filed cross-motion.

## II. Discussion

Defendants move to dismiss Plaintiff's FAC on the grounds that (1) Plaintiff's Title VII claims are untimely; (2) the Title VII claim against Sharan in his individual capacity fails as a matter of law; (3) Plaintiff fails to plausibly state disparate treatment, disparate impact, and hostile work environment claims; and (4) Sharan and Condon are entitled to qualified immunity. (Defs.' Mem. 9–21.) As for the PSAC, Defendants argue that the Motion is untimely and futile, largely for the reasons in support of their Motion to Dismiss. (*See* Defs.' Reply.)[15]

### A. Motion To Amend

#### 1. Standard of Review

Federal Rule of Civil Procedure 15 supplies the legal standard applicable to a motion to amend a complaint. Rule 15(a)(2) provides that leave to amend a complaint shall be "freely given when "justice so requires." Fed. R. Civ. P. 15(a)(2). However, "it is within the sound discretion of the district court to grant or deny leave to amend." *Green v. Mattingly*, 585 F.3d

---

[15] Defendants do not separately argue for the dismissal of any of the New York state claims, and the Court will not sua sponte consider dismissing them without briefing from the Parties.

97, 104 (2d Cir. 2009). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (noting that a court should deny leave to amend "in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party" (citing *Foman*, 371 U.S. at 182)). However, "[o]utright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) (citing *Foman*, 371 U.S. at 182).

### a. Futility

"To determine whether a proposed pleading is futile, courts analyze whether it would withstand a motion to dismiss." *Agerbrink v. Model Service LLC*, 155 F. Supp. 3d 448, 456 (S.D.N.Y. 2016) (citation omitted); *see also AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726 (2d Cir. 2010) ("Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact." (citation omitted)).[16] "The opposing party must establish that granting leave to amend

---

[16] The Court first considers the Motion To Amend because in order to determine whether the proposed pleading is futile, the Court necessarily applies the Rule 12(b)(6) standard. The Court here essentially considers the merits of the Motion To Dismiss in light of the PSAC. *See MB v. Islip Sch. Dist.*, No. 14-CV-4670, 2015 WL 3756875, at *4 (E.D.N.Y. June 16, 2015) (stating that in cases where defendants move to dismiss and plaintiffs cross-move to amend, courts have a variety of ways in which to deal with the pending motions, including "considering the merits of the motion to dismiss in light of the proposed amended complaint" (citation and quotation marks omitted)). The PSAC adds factual allegations and details to the FAC without changing the causes of action or adding defendants, such that if the Court concludes that the amendments are futile, the less detailed pleadings in the FAC also necessarily fail, and the

would be futile." *Blagman v. Apple, Inc.*, No. 14-CV-5453, 2014 WL 2106489, at *5 (S.D.N.Y. May 19, 2014) (citations omitted).

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id*. at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id*. at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id*.; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R.

---

Motion To Dismiss would necessarily be granted as to those claims. Where the Court finds that the amendments would be futile, the claim will accordingly be dismissed.

Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . . " (internal quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citation omitted).

Generally, "[i]n adjudicating a [motion to dismiss], a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). "To go beyond the allegations in the [c]omplaint would convert the . . . motion to dismiss into one for summary judgment." *Thomas*, 232 F. Supp. 2d at 27.

### b.  Prejudice, Delay, and Bad Faith

If a party challenges a proposed amendment on the ground of prejudice, a court must evaluate whether the amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Agerbrink*, 155 F. Supp. 3d at 454 (quotation marks omitted) (quoting *Monahan v. N.Y.C. Dep't of Corrs.*, 214 F.3d 275, 284 (2d Cir. 2000)).  Courts also consider the procedural posture of the

case. *See, e.g.*, *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) ("Undue prejudice arises when an amendment comes on the eve of trial and would result in new problems of proof." (citation, quotation marks, and alterations omitted)); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (affirming denial of leave to amend sought after discovery had closed and while summary judgment motion was pending). Although "[p]rejudice to the opposing party . . . has been described as the most important reason for denying a motion to amend," *Frenkel v. N.Y.C. Off-Track Betting Corp.*, 611 F. Supp. 2d 391, 394 (S.D.N.Y. 2009) (citation omitted), *adopted by* 701 F. Supp. 2d 544 (S.D.N.Y. 2010), only "undue" prejudice warrants denial of leave to amend, *A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000). The opposing party "bears the burden of demonstrating that substantial prejudice would result were the proposed amendment to be granted." *Agerbrink*, 155 F. Supp. 3d at 454 (citation omitted).

As to delay, in the Second Circuit, "[m]ere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (citations omitted); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000) (noting that "'mere delay' is not, of itself, sufficient to justify denial of a Rule 15(a) motion" (citation omitted)). Where a significant period of time has passed prior to filing a motion to amend, however, the moving party must provide a "satisfactory explanation" for the delay. *Park B. Smith, Inc. v. CHF Indus. Inc.*, 811 F. Supp. 2d 766, 779 (S.D.N.Y. 2011) (collecting cases); *see also Margel v. E.G.L. Gem Lab Ltd.*, No. 04-CV-1514, 2010 WL 445192, at *11 (S.D.N.Y. Feb. 8, 2010) ("[T]he court may deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice other parties." (citation,

emphasis, and quotation marks omitted). However, courts have allowed amendment despite long intervals between the discovery of certain facts and the filing of an amended pleading. *See, e.g.*, *Valentini v. Citigroup, Inc.*, No. 11-CV-1355, 2013 WL 4407065, at *7 (S.D.N.Y. Aug. 16, 2013) (finding delay of eighteen months "insufficient ground to warrant denial of [a] motion to amend" where non-moving party "failed to establish bad faith or undue prejudice"); *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 98 (S.D.N.Y. 2010) (allowing amendment two and one-half years after case began and noting that "even vague or 'thin' reasons [for delay] are sufficient, in the absence of prejudice or bad faith" (citations omitted)).

"[W]hen the opponent of an amendment asserts that the movant is acting in bad faith, there must be something more than mere delay or inadvertence for the court to refuse to allow amendment." *Primetime 24 Joint Venture v. DirecTV*, Inc., No. 99-CV-3307, 2000 WL 426396, at *5 (S.D.N.Y. Apr. 20, 2000); *see also Blagman*, 2014 WL 2106489, at *3 ("To the extent that the defendants claim that [the plaintiff's] delay was strategic, they provide no showing of bad faith apart from the delay itself."); *Randolph Found. v. Duncan*, No. 00-CV-6445, 2002 WL 32862, at *3 (S.D.N.Y. Jan. 11, 2002) ("[T]he fact that a party may have had evidence to support a proposed amendment earlier in the litigation does not, by itself, give rise to an inference of bad faith.").

2. Futility of PSAC[17]

a. Timeliness of the Title VII Claims[18]

Defendants argue that Plaintiff did not file this Action within 90 days of receiving his

EEOC right-to-sue letter as required by law. (Defs.' Mem. 9.)

Under Title VII, a claim must be filed in federal court within 90 days of the plaintiff's

receipt of a right-to-sue letter from the EEOC. *See* 42 U.S.C. § 2000e–5(f)(1); *see also Zerilli-*

*Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 77 (2d Cir. 2003) (noting a plaintiff must "file[ ]

a civil complaint within [90] days of receiving a right-to-sue letter, as required by 42 U.S.C.

§§ 2000e–5(f)(1) and 12117(a)"). "This [90]-day filing requirement also functions as a statute of

limitations," *Williams v. Wellness Med. Care, P.C.*, No. 11-CV-5566, 2013 WL 5420985, at *4

(S.D.N.Y. Sept. 27, 2013), and "is subject to the doctrine of equitable tolling," *Barbosa v.*

*Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 216 (S.D.N.Y. 2010); *see also Vollinger*

*v. Merrill Lynch & Co., Inc.*, 198 F. Supp. 2d 433, 440 (S.D.N.Y. 2000) ("[T]he [90]-day filing

requirement is akin to a statute of limitations and is subject to waiver, equitable estoppel, and

equitable tolling."). When the receipt date is unclear or unknown, "courts generally presume that

---

[17] Defendants only summarily argue that the Motion To Amend is untimely and will cause further delay but do not cite a single case in support of their position. (*See* Defs.' Reply.) "Courts need not consider cursory arguments of this kind, and the Court declines to do so here." *Grant v. City of Syracuse*, No. 15-CV-445, 2017 WL 5564605, at *12 n.12 (N.D.N.Y. Nov. 17, 2017) (citation, alterations, and quotation marks omitted). The Court therefore will not deny the Motion To Amend on grounds of prejudice, delay, or bad faith, as Defendants do not meaningfully raise those arguments, and because it is not clear to the Court that any of those concerns arise in this Action at this stage.

[18] The Court treats Defendants' Memorandum and Reply both as responsive to Plaintiff's Motion To Amend, even though the Memorandum pre-dates Plaintiff's Motion. Most of the allegations in the FAC and PSAC are identical and therefore Defendants' Memorandum addresses both. Moreover, Defendants indicated that they have fully responded to Plaintiff's Motion. (Dkt. No. 51.)

a mailed document is received three days after the date on which it is sent." *Hughes v. Elmira College*, 584 F. Supp. 588, 590 (W.D.N.Y. 2008) (citations and quotation marks omitted). The three-day presumption may be rebutted, however, by admissible evidence, such as an affidavit by the claimant stating the actual date of receipt. *See Sherlock*, 84 F.3d at 526 ("If a claimant presents sworn testimony or other admissible evidence from which it could reasonably be inferred either that the notice was mailed later than its typewritten date or that it took longer than three days to reach her by mail, the initial presumption is not dispositive."); *Holmes v. NBC/GE*, 914 F. Supp. 1040, 1043-44 (S.D.N.Y. 1996) (same); *Smith v. Local Union 28 Sheet Metal Workers*, 877 F. Supp. 165, 172 (S.D.N.Y. 1995) (same).

Here, Defendants argue that the EEOC sent Plaintiff a right to sue letter on November 27, 2018, that Plaintiff is presumed to have received it three days later, on November 30, 2017, that Plaintiff thus had until February 28, 2018 to file suit, and that Plaintiff did not so file until March 1, 2018. (Defs.' Mem. 9.) Plaintiff's counsel has, however, submitted an affidavit stating that she did not receive the EEOC right to sue letter until December 4, 2017 and it was delivered to her office on December 1 or 2, 2017 and no earlier, so that Plaintiff's filing on March 1, 2018 would have been timely. (Pl.'s Mem. 4 (citing Walsh Decl. 1–3).) The Court thus finds that Plaintiff has rebutted the three-day presumption, and at this stage will not dismiss Plaintiff's Title VII claims on timeliness grounds. *See Edwards v. Onondaga Cmty. Coll.*, No. 14-CV-1329, 2015 WL 7283187, at *4 (N.D.N.Y. Nov. 16, 2015) (holding that the three-day presumption of delivery was rebutted by the plaintiff's sworn affidavit stating that she did not receive the right to sue letter until a later date); *Gardner v. Honest Weight Food Co-op., Inc.*, 96 F. Supp. 2d 154, 159 (N.D.N.Y. 2000) (same); *Hogarth v. N.Y.C. Health & Hosps. Corp.*, No. 97-CV-625, 2000 WL 375242, at *4 (S.D.N.Y. Apr. 12, 2000) ("[T]he presumption of delivery

can be successfully rebutted with a sworn affidavit . . . supporting the conclusion that the mail was never received." (citation omitted)).

### b.  Title VII Claims Against Sharan in His Individual Capacity

Defendants correctly argue that Plaintiff's Title VII claims against Sharan in his individual capacity fail because "individuals are not subject to liability under Title VII," (Defs.' Mem. 9 (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (citation and quotation marks omitted)).  Accordingly, the Court dismisses Plaintiff's Title VII claims against Sharan in his individual capacity.  *See Bamba v. Fenton*, No. 15-CV-1340, 2017 WL 3446806, at *6 (E.D.N.Y. Aug. 10, 2017) (holding that "individuals are not subject to Title VII liability" (citing *Patterson*)).

### c.  Disparate Treatment Claim

Defendants argue that Plaintiff has not alleged facts sufficient to show that he suffered any adverse action motivated by discriminatory animus.  (Defs.' Mem. 9.)

As relevant here, Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color."  42 U.S.C. § 2000e-2(a)(1).  To prevail on a claim under Title VII in the absence of direct evidence of discrimination, a plaintiff usually must satisfy the *McDonnell Douglas* three-part burden-shifting test.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of making out a prima facie case of discrimination.  *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  To state a prima facie case of discrimination under Title VII, a plaintiff "must show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held;

(3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *see also Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 519 (S.D.N.Y. 2016) (same), *aff'd*, 689 F. App'x 670 (2d Cir. 2017). If the plaintiff states a prima facie case, "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action." *Holcomb*, 521 F.3d at 138 (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also Abdu-Brisson*, 239 F.3d at 468 (same). "If such a reason is provided, [the] plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Holcomb*, 521 F.3d at 138; *see also Abdu-Brisson*, 239 F.3d at 469 ("Once the employer has articulated non-discriminatory reasons for the challenged employment actions, the presumption of discrimination vanishes and the burden shifts back to the plaintiff to come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory.").

The prima facie case requirement does not require that the plaintiff provide "evidence sufficient to show discriminatory motivation," but rather creates "a temporary presumption of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment action against the plaintiff." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015) (citations and quotation marks omitted). The prima facie case is an evidentiary standard, and not a pleading requirement; therefore, a plaintiff need not *allege* a prima facie case to survive a motion to dismiss his discrimination claim. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002)

("[A] complaint in an employment discrimination lawsuit [need not] contain specific facts establishing a prima facie case of discrimination . . . ."); *see also Ingrassia v. Health & Hosp. Corp.*, 130 F. Supp. 3d 709, 719 (E.D.N.Y. 2015) ("A plaintiff alleging employment discrimination thus may withstand a motion to dismiss without pleading each element of a prima facie case." (citation and italics omitted)).

The Second Circuit has explained "what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311. "The facts required . . . to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination," but rather the facts "need only give plausible support to a minimal inference of discriminatory motive." *Id.*; *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) ("[A] plaintiff must allege that the employer took adverse action against [him] at least in part for a discriminatory reason, and [he] may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination."). Courts making the plausibility determination should do so "mindful of the elusive nature of intentional discrimination," and the concomitant frequency by which plaintiffs must "rely on bits and pieces of information to support an inference of discrimination, i.e., a mosaic of intentional discrimination." *Vega*, 801 F.3d at 86–87 (citation, italics, and quotation marks omitted).

Here, Defendants do not dispute that Plaintiff has alleged that he is a member of a protected class, that he was qualified for his position, and that he suffered an adverse

employment action.  Instead, Defendants argue that Plaintiff has failed to demonstrate that the charges were motivated by racial discrimination.  (Defs.' Mem. 10.)  Defendants principally argue that Plaintiff has failed to "compare himself to employees who are similarly situated in all material respects."  (*Id*. at 11 (citation and quotation marks omitted).)

"An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."  *Littlejohn*, 795 F.3d at 312 (citation and quotation marks omitted).  "[A] plaintiff alleging discrimination based on disparate disciplinary treatment must demonstrate that [he] was subject to an adverse employment action and that a similarly situated employee not in the relevant protected group received better treatment."  *Campbell v. County of Onondaga*, No. 04-CV-1007, 2009 WL 3163498, at *15 (N.D.N.Y. Sept. 29, 2009) (citation and quotation marks omitted).  Furthermore, a "[p]laintiff must demonstrate that [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself]."  *Jenkins v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 09-CV-12, 2009 WL 3682458, at *7 (S.D.N.Y. Oct. 29, 2009) (citation and quotation marks omitted); *see also Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A plaintiff relying on disparate treatment evidence must show [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself]." (citation and quotation marks omitted)).  Courts consider, among other factors, (1) "whether the plaintiff and those [he] maintains were similarly situated were subject to the same workplace standards"; and (2) "whether the conduct for which the employer imposed discipline was of comparable seriousness."  *Jenkins*, 2009 WL 3682458, at *7; *see also Graham v. Long Isl. R.R.*,

230 F.3d 34, 40 (2d Cir. 2000) ("[A] plaintiff must show that [his] co-employees were subject to the same performance evaluation and discipline standards.").

"[A]lthough, at the motion to dismiss stage, evidence of similarly situated comparators is not necessary, a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Weslowski v. Zugibe*, 14 F. Supp. 3d 295, 319 (S.D.N.Y. 2014) (citation, alterations, and quotation marks omitted); *see also Littlejohn*, 795 F.3d at 312 ("[A]dverse actions taken against employees who are not similarly situated cannot establish an inference of discrimination." (citation omitted)); *McDowell v. N. Shore-Long Isl. Jewish Health Sys., Inc.*, 839 F. Supp. 2d 562, 569 (E.D.N.Y. 2012) ("With respect to a comparator analysis, all that a plaintiff is required to allege, at the pleadings stage, is that he is a member of a racial class, he was punished more severely than those outside of his racial class who were similarly situated in all material respects, and the severity of that punishment is related to his race . . . .").

In his PSAC, Plaintiff broadly alleges that the Town discriminated against non-white workers by disciplining them more harshly than Caucasian workers. (PSAC ¶ 36.) Plaintiff lists several current and former Caucasian Town employees who he alleges, over many years, received more favorable treatment than he did: Adam Peltz, Anthony Mallia, John Meyers Jr., Brian Downey, Michael Migdallan, James Sharan, and Michael Brown. (*Id.* ¶¶ 36–37.) Some of these comparators are not similar to Plaintiff "in all material respects," or, in some cases, in any respect. In particular, Adam Peltz is a former Town fire inspector who was investigated and suspended for submitting falsified reports of inspections of Town Schools. (*Id.* ¶ 36.) Anthony Mallia is a Town Building Inspector who allegedly falsified building reports and who resigned after facing 188 felony counts to which he pleaded guilty. (*Id.* ¶¶ 37, 39.) Yet, Plaintiff does not

allege facts suggesting that Peltz or Mallia is a similarly situated comparator. They worked in different Town departments, performed different jobs, reported to different supervisors, and were ultimately subjected to different disciplinary actions. As for John Meyers Jr., Plaintiff does not allege what his position was, or to whom he reported. Meyers's offense and punishment were also different—he was allegedly caught on surveillance cameras in 2012 breaking into a highway department office and stealing highway department property, but was only briefly suspended and remains on the Town payroll in a different department. (*Id.*) Thus, Plaintiff does not plausibly allege that any of Peltz, Mallia, or Meyers, is a similarly situated comparator. *See Albury v. J.P. Morgan Chase*, No. 03-CV-2007, 2005 WL 746440, at *10 (S.D.N.Y. Mar. 31, 2005) (finding alleged comparator not similarly situated where record showed co-worker worked in different department, had different job title, and different supervisor); *Gambrell v. Nat'l R.R. Passenger Corp.*, No. 01-CV-6433, 2003 WL 282182, at *7 n.12 (S.D.N.Y. Feb. 3, 2003) (finding that when plaintiff reports to "wholly different supervisors" the strength of the inference of different treatment is "greatly weaken[ed]").

However, Plaintiff does sufficiently allege the existence of appropriate comparators as to the other highway department employees, namely Brian Downey, Michael Migdallan, James Sharan, and Michael Brown. (PSAC ¶¶ 27, 37.) Brian Downey was allegedly suspended for one month for taking a highway department truck to an unauthorized location, (PSAC ¶ 37); Michael Migdallan allegedly played golf while on workers' compensation leave, resulting in minimal consequences, if any (*id.*); James Sharan allegedly crashed a Town-owned commercial vehicle and suffered no consequences, (*id.*); and Michael Brown brought weapons to work and threatened minorities with them, and engaged in other fighting, but was never charged, (*id.* ¶ 27). Plaintiff's supposed offenses were that he disobeyed his supervisor's orders, that he failed to

report for snowplowing duty, and repeatedly filed false work reports. (*See* Gelb Decision.) Defendants argue that, because the putative comparators' offenses are not the same as Plaintiff's, the other highway department employees are not satisfactory comparators. (Defs.' Mem. 13.) The Court disagrees.

"[T]he law does not require detailed pleadings regarding the similarly situated comparators. To the contrary, the Second Circuit [has] implied . . . that allegations that [Plaintiff] and comparators worked in the same [department], were accountable to the same supervisors, but were subjected to disparate treatment may be sufficient to raise an inference of discrimination," especially at the motion to dismiss stage, where all inferences must be construed in favor of Plaintiff. *Yang v. Dep't of Educ. of City of New York*, No. 14-CV-7037, 2016 WL 4028131, at *9 (E.D.N.Y. July 21, 2016); *see also Graham*, 230 F.3d at 42 ("As previously stated, to be similarly situated, [the putative comparators] must have been subject to the same disciplinary standards and have engaged in conduct of comparable seriousness." (citation omitted)). Here, Plaintiff's allegations suggest that Downey, Migdallan, James Sharan, and Michael Brown arguably engaged in *more* serious misconduct than Plaintiff and were minimally, if at all, penalized. (*See* PSAC ¶¶ 27, 37.) Construing all inferences favorably to Plaintiff, his infractions of not following orders on one occasion, engaging in one disagreement with Michael Brown (which was allegedly initiated by Michael Brown), and missing one early morning call for a snowstorm, (*id.* ¶¶ 22–29), are at least comparable with if not less severe than Downey "repeatedly" taking a highway department truck to "an unauthorized location"; Migdallan "constantly abus[ing] leave time" and being "caught playing golf while on workers' compensation leave"; James Sharan not "holding a driver's license" and "crash[ing] a Town-owned commercial vehicle"; and Michael Brown "[bringing] weapons" to the workplace "more

than once." (*Id.* ¶¶ 27, 37.) None of these putative comparators was terminated, and, other than Downey, who was only suspended for one month and eventually was "returned to his former pay grade or even a higher pay grade," allegedly received any penalties for their misconduct at all. (*Id.*) Importantly, for Plaintiff to plausibly allege appropriate comparators, "[t]he conduct in question does not have to be identical." *Edwards v. Khalil*, No. 12-CV-8442, 2016 WL 1312149, at *17 (S.D.N.Y. Mar. 31, 2016) (citation omitted). Moreover, whether acts are of "comparable seriousness requires . . . an examination of the context and surrounding circumstances," which is typically a very "fact-specific" inquiry. *Id.* (citation omitted). Therefore, at this stage of the case, the Court holds that Plaintiff has plausibly alleged that Downey, Migdallan, James Sharan, and Michael Brown are appropriate comparators who received less severe disciplinary treatment for comparable—if not more serious—offenses. *See O'Toole, as Tr. of Estate of Fratto v. County of Orange*, No. 16-CV-2059, 2019 WL 1099721, at *7–9 (S.D.N.Y. Mar. 8, 2019) (finding that male probationary officers who "were subject to the same workplace standards" as the plaintiff were proper comparators because they "committed similarly serious (or more serious) infractions to [the plaintiff's]—and yet were promoted"); *Edwards*, 2016 WL 1312149, at *18–20 (finding that the plaintiff's claims survived a motion for summary judgment even though the putative comparators had different disciplinary records and types of offenses because "a reasonable juror could conclude" that the comparators were similarly situated); *Senno v. Elmsford Union Free Sch. Dist*, 812 F. Supp. 2d 454, 476 (S.D.N.Y. 2011) (denying summary judgment where the comparator "in a broad sense" held a similar position to the plaintiff and the plaintiff alleged that the comparator "engaged in similar conduct . . . if not more egregious than [the plaintiff's], without mitigating circumstances that could distinguish their conduct"); *see also Graham*, 230 F.3d at 43 (cautioning district courts not to use

"an unduly inflexible standard" in dismissing employment discrimination claims based on a lack of appropriate comparators because "[w]hether these employees were similarly situated present[s] a material question of fact").

At this point in the disparate treatment inquiry, "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action." *Holcomb*, 521 F.3d at 138 (quoting *McDonnell Douglas*, 411 U.S. at 802). However, Plaintiff "is not required at the pleading stage to anticipate what nondiscriminatory reasons [Defendants] might proffer and to rebut those reasons in the [PSAC]. . . . Accordingly, while Defendant[s] may wish to renew this argument upon a motion for summary judgment, Defendant[s] cannot raise this argument upon a motion to dismiss." *Yang*, 2016 WL 40283131, at *9; *see also Edwards*, 2016 WL 1312419, at *20 ("Defendants have not provided a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject." (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)).

Therefore, Plaintiff's disparate treatment claims survive Defendants' Motion.

### d. Disparate Impact Claim

Defendants argue that "Plaintiff does not identify any specific, facially neutral employment policies that have a disparate impact on minorities," and "does not adequately allege a causal connection between any facially neutral policy at the Highway Department and his eventual termination, or any other adverse employment action." (Defs.' Mem. 14.)

Under the disparate impact theory, Title VII prohibits employment practices that are "facially neutral, but fall more harshly on one group than another and cannot be justified by some business necessity." *Hayden v. County of Nassau*, 180 F.3d 42, 52 (2d Cir. 1999). Unlike disparate treatment claims, therefore, a plaintiff need not show discriminatory intent. *See Griggs*

*v. Duke Power Co*., 401 U.S. 424, 432 (1971) (noting that an employer's "good intent" is irrelevant to a disparate impact claim). "To make out a prima facie disparate impact case, a plaintiff therefore must (1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Barrett v. Forest Labs., Inc*., 39 F. Supp. 3d 407, 428 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also Malave v. Potter*, 320 F.3d 321, 325 (2d Cir. 2003) (same). In establishing a prima facie case, the Second Circuit has held that "[a]llegations which contend only that there is a bottom line racial imbalance in the work force are insufficient." *Brown v. Coach Stores, Inc*., 163 F.3d 706, 712 (2d Cir. 1998) (citations omitted); *Watson v. Richmond Univ. Med. Ctr*., No. 14-CV-1033, 2015 WL 5316233, at *3 (E.D.N.Y. Aug. 19, 2015) (same). Instead, a disparate impact plaintiff must establish that a comparison between individuals affected and those unaffected by the questioned policy reveals "that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals." *Town & Country Adult Living, Inc. v. Vill./Town of Mount Kisco*, No. 17-CV-8586, 2019 WL 1368560, at *14 (S.D.N.Y. Mar. 26, 2019) (citations omitted); *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 382 (2d Cir. 2006) (stating that a plaintiff must produce "statistical evidence" showing that the identified employment practice "causes a disparate impact").

Plaintiff alleges that several policies within the Highway Department had disparate impacts on minorities workers. In particular, Plaintiff alleges that there is no objective performance rating system in the Highway Department, that this allows for subjective assessments by Caucasian managers, and that these assessments are disproportionately unfavorable to minorities. (PSAC ¶ 39.) The Court concludes that Plaintiff adequately alleges the existence of a facially neutral performance rating system that provides unchecked discretion

to supervisors and subsequently causes minority employees to be passed over for promotions or treated more negatively. *See Martin v. Coinmach Corp.*, No. 15-CV-8137, 2016 WL 6996182, at *7 (S.D.N.Y. Nov. 29, 2016) (holding that a "company's policy of making all merit increases dependent entirely on the discretion of a white supervisor, in the absence of any objective criteria to cabin or direct that individual's judgment is a 'specific employment practice'" for purposes of a disparate impact claim); *see also McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 907 (N.D. Ill. 2011) (finding disparate impact claim stated where the complaint identified policy of giving certain supervisors "unchecked discretion" and "policy of not considering for promotion individuals with recent disciplinary records," and alleged that this led African-American candidates to be "passed over in large numbers").

Plaintiff also alleges that the Town and the Highway Department "by practice and custom, engage[] in nepotism and ethnic tribalism in hiring practices." (PSAC ¶ 39.) Caucasian men allegedly almost exclusively manage, and subsequently "favor, hir[e] and promot[e] their own sons and others who are from similar ethnic and social groups more frequently than they hire and promote non-whites." (*Id.*) Plaintiff alleges that this practice disproportionately disfavors Hispanics, African-Americans and other non-white minorities. (*Id.*) Plaintiff points to the example of James Sharan, Sharan's son, who held the title of MEO II, even without the minimum qualifications for the position. (*Id.* ¶ 16.) The Court concludes that this allegation plausibly establishes the existence of a policy of nepotism and cronyism that leads to inferior treatment of minorities. *See Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 655 n.9 (1989) (noting that "nepotism, if it were proved to exist, could . . . be subject to challenge if it had a disparate impact on minorities"), *superseded by statute on other grounds*, 105 Stat. 1071 (1991); *Hagan v. City of New York*, 39 F. Supp. 3d 481, 499 (S.D.N.Y. 2014) (holding disparate

impact claim survived dismissal where the plaintiff alleged "cronyism" as a policy that led to inferior terms and conditions of employment for minority employees).

Plaintiff identifies three other policies but, according to Plaintiff's own allegations, these policies are not facially neutral. Plaintiff alleges that within the Highway Department there is no time clock, and that DeMont subsequently marks minorities who walk in the door at the same time as Caucasian employees as having arrived late. (PSAC ¶ 39.) Plaintiff thus alleges that DeMont treats minorities differently. Plaintiff also alleges that "the Town by practice and custom, favors certain politically powerful ethnic groups, in particular, Orthodox Jewish people, who represent a large and active voting bloc," (*id*.), and that this ultimately results in disparate unfavorable treatment of those who are not in such positions, i.e., minority employees who are less likely to be in positions to issue licenses, permits[,] and other governmental benefits," (*id*.). This policy too specifically targets different employees based on their ethnicity or religion. Plaintiff also alleges that the Town adjusted requirements for promotions in order to avoid promoting minorities, and specifically alleges that a road test was changed to keep him from obtaining a promotion, and that his African-American friend too was suspended to keep him from obtaining a promotion. (*Id*. ¶ 40.) This policy or practice too is not facially neutral inasmuch as Defendants are alleged specifically to target minorities to prevent them from being promoted. *See Hopkins v. Bridgeport Bd. of Educ*., 834 F. Supp. 2d 58, 68 (D. Conn. 2011) (holding that the plaintiff failed to state a facially neutral policy because he specifically alleged that the defendant "refus[ed] to provide employment references" to African-American males). Accordingly, Plaintiff cannot state a disparate impact claim with respect to these policies.[19]

_____

[19] The Court notes that these alleged practices would also fail as disparate treatment claims. Plaintiff does not plausibly allege that these actions caused him to "suffer[] an adverse

Accordingly, Plaintiff's PSAC plausibly states a disparate impact claim with respect to the policy of not having a performance rating system and the policy of nepotism, and the proposed amendment is thus not futile as to those claims. However, the PSAC does not state disparate impact claims with respect to the lack of a time clock, the policy of favoring the Orthodox Jewish community, and the adjusted promotion requirements, and the proposed amendments are therefore futile as to those claims.

### e. Altered Test Score Claim

The Civil Rights of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(l); *see also Hayden*, 180 F.3d at 52 ("The statute, on its face, clearly prohibits methods which utilize different scoring techniques or adjust candidates' scores on the basis of race.").

Plaintiff alleges that in 2015 he applied for an MEO II opening. (PSAC ¶ 18.) As part of the application process Plaintiff took a road test and was told by the Rockland County examiner that he had passed and would be a great MEO II. (*Id*.) However, soon thereafter, Sharan told Plaintiff he had failed and showed Plaintiff a written copy of the test report with scores that appeared to have been erased and written over. (*Id*.) Defendants argue that Plaintiff does not allege that any Defendant actually changed his test scores, or that it happened on account of race. (Defs.' Mem. 15.) However, Plaintiff is not required to comply with a "hypertechnical, code-

---

employment action." *Olivier v. County of Rockland*, No. 15-CV-8337, 2018 WL 401187, at *6 (S.D.N.Y. Jan. 11, 2018 (quoting *Holcomb*, 521 F.3d at 138).

pleading regime" to plausibly allege a claim.  *Iqbal*, 556 U.S. at 579.  Plaintiff repeatedly alleges

facts suggesting Sharan's "inferior treatment of minorities," (PSAC ¶ 14), and uses the test score

alteration as one example of such discrimination.  Plaintiff alleges that his road test score

somehow went from passing to failing once he interacted with Sharan; therefore, the Court

concludes that PSAC plausibly alleges that Sharan altered his test scores to avoid giving Plaintiff

a promotion.  (*Id*. ¶ 18.)

### f.  Retaliation Claim

Plaintiff alleges he engaged in protected activity in early 2015 when he confronted

Sharan about not getting his promotion and threatened to expose to the public Sharan's

discriminatory treatment of minority workers and the fact that Sharan's son was earning a high

salary as a MEO II even though he was not qualified for that position.  (PSAC ¶¶ 18–20.)

Plaintiff alleges that subsequent to this confrontation a campaign of close monitoring and

subjecting plaintiff to heightened scrutiny began.  (*Id*. ¶¶ 21–29.)  Plaintiff alleges that he was

being subjected to "an unusual and increased level of scrutiny and criticism," and therefore again

engaged in protected activity by filing a discrimination complaint with the Rockland Chapter of

the NAACP.  (*Id*. ¶ 26.)  On March 11, 2016, the Town served charges on Plaintiff for 13 alleged

violations of law and suspended him without pay for 30 days, the legal maximum suspension

pending trial.  (*Id*. ¶ 30.)  On March 29, 2016, Plaintiff filed a charge of discrimination against

the Town with the Rockland County Human Rights Commission, which in turn referred the

charge to the NYSDHR. (*Id.* ¶¶ 7–8, 33; NYSDHR Determination.) Plaintiff was terminated effective November 30, 2016. (PSAC ¶ 61.)

Defendants argue that the initial complaint to Sharan was not protected activity, and that Plaintiff does not allege a causal connection between any protected activity and an adverse action. (Defs.' Mem. 17.)

The anti-retaliation provision in Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). In other words, "Title VII forbids an employer to retaliate against an employee for . . . complaining of employment discrimination prohibited by Title VII." *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006). Thus, "for a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90.

Along similar lines, the Fourteenth Amendment protects public employees from racial discrimination and retaliation for complaining about race discrimination. *See Voccola v. Rooney*, 136 F. Supp. 3d 197, 205 (D. Conn. 2015). "[P]ublic employees aggrieved by discrimination in the terms of their employment may bring suit under . . . § 1983 against any responsible persons acting under color of state law." *Vega*, 801 F.3d at 87 (citation omitted). Where, as here, there is no dispute over whether a defendant acted under the color of state law, "a plaintiff's equal protection claim parallels his Title VII claim, except that a § 1983 claim, unlike a Title VII claim, can be brought against an individual." *Id.* Under either statute, a plaintiff "need not specifically plead every element" to survive a motion to dismiss; rather, he must allege sufficient

factual matter to "render [the] retaliation claims plausible." *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 187 (E.D.N.Y. 2012) (citing *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 71–72 (2d Cir. 2006)); *see also Gomez v. Stonybrook Univ.*, No. 14-CV-7219, 2016 WL 1039539, at *10 (E.D.N.Y. Jan. 28, 2016) (noting that *Vega* imposes a "minimal burden . . . at this early juncture" (quotation marks omitted)), *adopted by* 2016 WL 1045536 (E.D.N.Y. Mar. 15, 2016).

### i. Protected Activity

Defendants argue that the initial complaint to Sharan was an informal complaint against favoritism and was therefore not protected activity. (Defs.' Mem. 18–19.) Plaintiff counters that informal complaints about discrimination are protected activity. (Pl.'s Mem. 7.) It is true that internal complaints about favoritism and loyalty, rather than race or gender discrimination for example, may not be protected activity. *See Ruhling v. Tribune Co.*, No. 04-CV2430, 2007 WL 28283, at *21 (E.D.N.Y. Jan. 3, 2007) (holding that an internal complaint of favoritism was not protected activity where the plaintiff framed complaint as not involving discriminatory conduct). Here, however, Plaintiff did not speak to Sharan about his son's position alone; he also stated that he would expose Sharan's racially discriminatory treatment. (PSAC ¶¶ 18–20.) Thus the subject-matter of Plaintiff's informal internal complaint was race discrimination, and such informal complaints are indeed protected. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (holding that "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges," all are protected activities that can give rise to retaliation complaints); *Servello v. N.Y. Off. of Children & Family Servs.*, No. 18-CV-777, 2019 WL 974972, at *7 (N.D.N.Y. Feb. 28, 2019) (holding the plaintiff's informal protests to management

of discriminatory practices to be protected activity).  Moreover, the filing of the November 2015

NAACP complaint and the filing of the March 2016 complaint with the Rockland County

Human Services Division are clearly protected activities.  *See Kotcher v. Rosa & Sullivan*

*Appliance Ctr.*, 957 F.2d 59, 65 (2d Cir. 1992) (stating that "a protected activity generally

involves the filing of a formal complaint of discrimination with an administrative agency");

*Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) (same).

Plaintiff thus engaged in protected activity at some point in early 2015, in November

2015, and March 2016.

### ii.  Adverse Employment Action

Defendants do not, and indeed cannot, contest that the filing of formal charges and

Plaintiff's suspension without pay for 30 days in March 2016, and Plaintiff's termination in

November 2016 are adverse employment actions.  *See Vega*, 801 F.3d at 85 (stating that

termination and a material loss of benefits are adverse employment actions).

Plaintiff argues that the heightened surveillance and reprimands he experienced after

complaining to Sharan are also adverse actions.  (Pl.'s Mem. 8–9.)  However, "courts in this

circuit have found that reprimands, threats of disciplinary action[,] and excessive scrutiny do not

constitute adverse employment actions in the absence of other negative results such as a decrease

in pay or being placed on probation."  *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429

(S.D.N.Y. 2006) (citation and quotation marks omitted).  Plaintiff himself alleges that he was not

disciplined or formally warned when he was called to Van Dunk and Sharan's offices for talks

during that period, (PSAC ¶¶ 23, 25), thus undercutting his claim that these actions constituted

adverse employment action.  *See Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]n

employee does not suffer a materially adverse change in the terms and conditions of employment

where the employer merely enforces its preexisting disciplinary policies in a reasonable manner."); *Brooks v. City of Utica*, 275 F. Supp. 3d 370, 377–78 (N.D.N.Y. 2017) (holding that allegation of "daily inspections and monitoring to ensure compliance" with city's dress code was not an adverse employment action).

Thus, Plaintiff first experienced an adverse employment action in March 2016 when formal charges were filed against him and he was suspended, and in November 2016 when he was terminated.

### iii. Causal Connection

With respect to the causation element for a claim of retaliation, "a plaintiff must plausibly plead a connection between the act and his engagement in protected activity." *Vega*, 801 F.3d at 90. A plaintiff can demonstrate the causal connection one of two ways: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Richardson v. Bronx Lebanon Hosp.*, No. 11-CV-9095, 2014 WL 4386731, at *12 (S.D.N.Y. Sept. 5, 2014) (same). "Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (citation omitted).

Here, at the very least there is a causal connection because of temporal proximity, a four-month gap, between the November 2015 NAACP complaint and the March 2016 charges and

suspension being brought against Plaintiff.  (PSAC ¶¶ 26, 30.)  *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir. 2006) ("[T]he lapse of only several months after the letter and several weeks after the press conference between the protected speech and the adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment." (collecting cases)); *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 438 (E.D.N.Y. 2009) (holding that four-month gap between complaint and termination was sufficient to establish causal connection); *see also Jute v Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005) (holding that trial court erred by refusing to consider evidence of retaliation for protected activity that began 12 years before an ultimate retaliatory event because the earlier non-actionable acts of retaliation could show a "chain of events" connecting the protected activity to the adverse actions); *Chan v NYU Downtown Hosp.*, No. 03-CV-3003, 2004 WL 213024, at *3 (S.D.N.Y. Jan. 30, 2004) ("[E]vidence of an intervening pattern of antagonism between the complainant and [the plaintiff's] employer could support an inference that an alleged retaliatory act that was taken against the complainant was causally related to her complaint of discrimination.").  Thus, Plaintiff plausibly pleads a causal connection between his protected activity and the subsequent retaliatory conduct he alleges.

Accordingly, the Court finds that Plaintiff's PSAC states a retaliation claim, and the proposed amendment is thus not futile as to that claim.

<u>g. Hostile Work Environment</u>

Defendants argue that Plaintiff does not meet the high burden of proving a hostile work environment claim because he alleges, at best, sporadic and isolated events, most of which did not involve him.  (Defs.' Mem. 16.)

To state a hostile work environment claim, a plaintiff must plead conduct that "(1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected status]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citation, alterations, and quotation marks omitted); *see also Ruiz v. City of N.Y.*, No. 14-CV-5231, 2015 WL 5146629, at *8 (S.D.N.Y. Sept. 2, 2015) (same).  The same standard is used, regardless of whether allegations are brought pursuant to § 1983 or Title VII.  *See Smith v. Town of Hempstead Dep't of Sanitation*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011).  In evaluating hostile work environment claims, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Ruiz*, 2015 WL 5146629, at *8 (same).  The actions taken by the defendant "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citation and quotation marks omitted).  The Second Circuit "treats the first two of these factors—the frequency and the severity of the misconduct—as the principal focus of the analysis." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009).  "Core hostile work environment cases involve misconduct that is both frequent and severe, for example, when a supervisor utters blatant racial

epithets on a regular if not constant basis and behaves in a physically threatening manner." *Id.* (citation and quotation marks omitted). Finally, "[i]t is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Richards v. N.Y.C. Dep't of Educ.*, No. 13-CV-16, 2015 WL 4164746, at *10 (S.D.N.Y. July 10, 2015) (citations and quotation marks omitted).

To survive a Rule 12(b)(6) motion, "a plaintiff need only plead facts sufficient to support the conclusion that [he] was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of [his] employment altered for the worse." *Patane*, 508 F.3d at 113 (alteration and quotation marks omitted). "The Second Circuit has 'repeatedly cautioned against setting the bar too high' in this context." *Ruiz*, 2015 WL 5146629, at *8 (quoting *Patane*, 508 F.3d at 113). Notably, while a few isolated racial slurs may not suffice, *see Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), the repeated use of certain clearly offensive and abusive language can create a hostile work environment, *see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000). "The environment need not be unendurable or intolerable" to be a hostile work environment. *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (citation and quotation marks omitted).

Here, Plaintiff alleges a series of disturbing incidences. O'Carroll, a foreman, allegedly "used the term nigger." (PSAC ¶ 15.) Sharan allegedly harassed a nonwhite employee who left the department when he was unable to take the harassment anymore and later committed suicide. (*Id.*) Sharan said about the deceased, upon learning of the suicide, "it's one less person on the payroll." (*Id.*) Plaintiff also alleges that Caucasian employees "isolated minorities and harassed them in petty ways, such as over the break room," (*id.*), and that minority workers are denied training and other opportunities, get older equipment and more dangerous equipment, and have

been marked late to work while their white colleagues who arrive at the same time are not, (*id*.¶¶ 38–39).  Plaintiff further alleges that promotional opportunities are intentionally denied to minority employees and alleges that his African-American coworker missed a test for a promotion because he was suspended, just so that a Caucasian worker could obtain the promotion.  (*Id*. ¶ 40.)

Construing all inferences in favor of Plaintiff, the Court concludes that Plaintiff has articulated enough instances of inappropriate conduct and commentary to plausibly allege a hostile work environment and that the proposed amendment is not futile as to this claim.  Even as to the allegations that are more general in nature or pertain to events not directly aimed at Plaintiff, a jury "crediting [Plaintiff's] general allegations could reasonably find pervasive harassment, even in the absence of specific details about each incident."  *Love v. Premier Util. Servs., LLC*, 186 F. Supp. 3d 248, 254–55 (E.D.N.Y. 2016) (noting that the word "nigger" is "objectively and inextricably linked to racial animus" and "even ostensibly race-neutral allegations," when viewed in context, may "plausibly be interpreted as contributing to a racially hostile environment" (citations and quotation marks omitted)) (citation omitted); *see also Spence v. Bukofzer*, No. 15-CV-6167, 2017 WL 1194478, at *2, 7–8 (S.D.N.Y. Mar. 30, 2017) (holding that a hostile work environment claim survived a motion to dismiss where plaintiff alleged that supervisors referred to black employees as "monkeys," plaintiff was excluded from meetings and received negative evaluations, and plaintiff's complaints about racist comments were ignored); *Lewis v. Roosevelt Island Operating Corp.*, 246 F. Supp. 3d 979, 989–90 (S.D.N.Y. 2017) (holding that hostile work environment claim survived a motion to dismiss where the plaintiff alleged "numerous racially-charged statements" and "a pattern of facially neutral comments and practices by his supervisor" that "made his job challenging"); *Crawford v. Nat'l R.R. Passenger*

*Corp.*, No. 15-CV-131, 2015 WL 8023680, at *7 (D. Conn. Dec. 4, 2015) ("Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory joke by a fellow employee or supervisor can also impact the work environment."); *Ruiz v. City of New York*, No. 14-CV-5231, 2015 WL 5146629, at *9 (S.D.N.Y. Sept. 2, 2015) (holding that hostile work environment claim survived motion to dismiss where the plaintiffs alleged that they were not allowed to speak Spanish, received more discipline than non-minority colleagues, and were the subject of an offensive text and graffiti"). [20]

### III. Conclusion

For the reasons stated above, Plaintiff's Motion is granted in part, and Defendants' Motion is granted in part and denied in part. The Court dismisses Plaintiff's Title VII claims against Sharan in his individual capacity. Plaintiff's disparate impact claims with respect to the lack of a time clock, the policy of favoring the Orthodox Jewish community, and the adjusted promotion requirements for minority employees are also dismissed. Plaintiff's retaliation,

---

[20] Defendants also argue that Sharan and Condon are entitled to qualified immunity because they did not violate any of Plaintiff's constitutional rights. (Defs.' Mem. 20–21.) Defendants posit that Plaintiff's only allegations against Condon are that she failed to implement certain policies and training procedures and that there is no clearly established law requiring her to implement such policies. (*Id*. at 20.) This misstates Plaintiff's allegations, as Plaintiff also alleges that Condon ignored or summarily dismissed minority workers' complaints, approved the retaliatory charges against Plaintiff, and enabled Sharan's ongoing racial discrimination, among other conduct. (PSAC ¶¶ 16, 32, 39.) Defendants' arguments are insufficient to raise a qualified immunity claim as to Sharan and Condon at this stage because they fail to establish that it is "beyond doubt that the plaintiff can provide no set of facts in support of his claim that would entitle him to relief." *Brown v. Halpin*, 885 F.3d 111, 117 (2d Cir. 2018); *see also Johnson v. Doty*, No. 15-CV-7823, 2019 WL 2137361, at *3 n.4 (S.D.N.Y. May 16, 2019) (declining to consider qualified immunity argument where defendants "merely restate[d] the qualified immunity caselaw without meaningfully applying that caselaw to the facts of th[e] case"); *Ben-Reuben v. Westchester County*, No. 17-CV-9156, 2019 WL 1406868, at *4 n.1 (S.D.N.Y. Mar. 28, 2019) (same); *White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at *19 n.17 (S.D.N.Y. Dec. 21, 2018) (same).

disparate treatment, altered test score, hostile work environment, and disparate impact claims with respect to the policy of not having a performance rating system and the policy of nepotism survive as discussed in the Opinion.

The claims that are dismissed are dismissed with prejudice, as Plaintiff, who is counseled, has already twice amended his Complaint, including in response to Defendants' pre-motion letters raising the arguments addressed in the instant Opinion, and based on conversations with opposing counsel and the Court during conferences. *Justice v. McGovern*, No. 11-CV-5076, 2013 WL 1809634, at *3 (E.D.N.Y. Apr. 29, 2013) ("Although when a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint, when the plaintiff is put on notice of the deficiencies in his complaint and fails to correct them in the amended complaint[,] dismissal with prejudice is proper" (citation, some alterations, and quotation marks omitted)); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 344 (S.D.N.Y. 2011) ("[A]s plaintiff has already amended his complaint twice, dismissal with prejudice is appropriate at this stage in the litigation." (citations omitted)).

The Clerk of the Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 40, 49.)

The Court will hold a Status Conference on November 13, 2019 at 11:30 a.m.

SO ORDERED.

DATED:     September 26, 2019
           White Plains, New York

                                         KENNETH M. KARAS
                                         UNITED STATES DISTRICT JUDGE